IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES L. SMITH,

                            Plaintiff,

    v.                                                     OPINION and ORDER

CANDACE WHITMAN,                                   18-cv-669-jdp

                            Defendant.

---

Plaintiff James L. Smith, appearing pro se, is a prisoner at Fox Lake Correctional Institution (FLCI). Smith alleges that defendant Candace Whitman ignored the risk of harm that the FLCI water posed to his health by refusing his requests for bottled water. Whitman has filed a motion for summary judgment. Dkt. 50. Smith did not respond to Whitman's motion, even after being given two extensions of time to do so. *See* Dkts. 55 and 61. I will grant Whitman's motion and dismiss the case because Smith fails to show either that the water caused his medical problems or that Whitman consciously disregarded his problems.

UNDISPUTED FACTS

Smith has not filed a brief or supporting materials opposing Whitman's motion for summary judgment. Therefore, I will consider most of Whitman's proposed findings of fact as undisputed. *See* Prel. Pretrial Conf. Packet, Dkt. 49-1, at 8 ("If a party fails to respond to a fact proposed by the opposing party, the court will accept the opposing party's proposed fact as undisputed."). But because Smith's original complaint in this action is a verified complaint stating under penalty of perjury that his allegations are true, Dkt. 1, I will consider that document as Smith's declaration. *See Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996)

(verified complaint can be admissible evidence at summary judgment if it otherwise satisfies the requirements for a declaration).

The parties discuss issues related to this court's previous litigation about contaminants in the FLCI water; I have included some facts from my summary judgment decision in that case for background purposes. *See Stapleton v. Carr*, 438 F. Supp. 3d 925, 927 (W.D. Wis. 2020).

Plaintiff James L. Smith was housed at FLCI starting in September 2014. Defendant Candace Whitman was the health services manager at FLCI.

Drinking water sometimes contains small amounts of contaminants. People often obtain part of their needed intake of copper from their drinking water, but exposure to elevated levels of copper can be hazardous to human health.

Lead is hazardous to human health; according to the National Institute of Environmental Health Sciences, "No blood lead level is safe."[1] The United States Environmental Protection Agency (EPA) states that it "has set the maximum contaminant level goal for lead in drinking water at zero because lead is a toxic metal that can be harmful to human health even at low exposure levels. Lead is persistent, and it can bioaccumulate in the body over time."[2] But that zero-lead goal is not enforced by law. Drinking water regulations set by the EPA establishes "action limits," also known as "maximum contaminant levels," for metals including lead, copper, and arsenic.

---

[1] National Institute of Environmental Health Sciences, *Lead*, https://www.niehs.nih.gov/health/topics/agents/lead/index.cfm.

[2] United States Environmental Protection Agency, *Basic Information about Lead in Drinking Water*, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

Several times between 2008 and 2013, water testing at FLCI showed lead and copper concentrations that exceeded the EPA's action level for lead and other metals. In May 2014, the Department of Corrections entered into a consent order with the Wisconsin Department of Natural Resources (DNR) regarding the water quality at FLCI. Specifically, FLCI agreed to provide "public education" regarding the lead and copper action level exceedances, submit plans for cleaning, flushing, monitoring, and rehabilitation of the wells in the system, and obtain compliance with the lead and copper standards. In June 2015, a memorandum was posted in each housing unit stating that elevated levels of lead were found in the drinking water in some of the FLCI buildings, and that people with a variety of medical conditions, including high blood pressure, would be more susceptible to injury from the contaminated water.

The DOC took various efforts to remediate the contaminant problem, and in December 2016 the DNR "closed out" the consent order. After that, the lead and copper test results fell below the action levels, but they were not zero.

Smith suffers from high blood pressure, for which he takes medication, and dyslipidemia (a lipid imbalance). Smith was also diagnosed with diabetes after he arrived at FLCI. Smith states that he suffers headaches, stomach pains and cramps, nausea, and bloody diarrhea, which he believes are caused by the FLCI drinking water. He states that the water was often discolored, had black particles in it, and smelled bad.

In mid-January 2017, Smith wrote to the Health Services Unit, stating that he was having problems with dizziness, asking whether it was related to his high blood pressure, and asking whether staff could monitor his blood pressure. A non-defendant nurse responded to the correspondence and assessed Smith, noting "No Apparent Abnormalities" and directing Smith to continue taking his medication. Dkt. 53-1, at 2–3.

In mid-April 2017, Smith submitted an "Interview/Information Request" form addressed to defendant Whitman, stating:

> Ms. Whitman, I have wrote u before about the water/my (HBP) one of you staff told me that u would have to take care of that cause there is nothing they could do, and I never got my request slip back. So once again is there anyway u could give me drinkable water that won't hurt me in the long run. I have 14 more years to do. Even your health memo say the water is bad for peoples with (High Blood Pressure).

*Id.* at 4. A couple of days later, Smith submitted another request asking why Whitman had not responded.

Whitman states that in meetings with the warden's office, she had been told that the institution water was being monitored and tested by the DNR and that it was safe for human consumption. Shortly after receiving Smith's first April 2017 request, she responded with a memo stating in part:

> The water has been deemed safe for consumption and there is no evidence that drinking water will produce negative side effects on your health. FLCI has worked extensively with the DNR and outside contractors to improve the overall water quality throughout the institution. Due to the extensive progress made in correcting the issue, most recent tests have shown that the levels of copper and lead are well below the threshold. Providing bottled water is not a necessary action that the institution needs to take as we are providing an appropriate water source.
>
> We do encourage everyone to run the faucet 15–30 seconds prior to consuming it. I hope that you find this information useful.

*Id.* at 6. This appears to have crossed in the mail stream with Smith's second April 2017 request.

Around the same time, Smith filed an inmate grievance stating that the contaminated FLCI water was harmful for people with high blood pressure. The institution complaint examiner spoke with Whitman about Smith's grievance. The examiner recommended that the

4

grievance be dismissed, stating that Whitman "stated the water quality at FLCI has been tested and deemed safe for consumption and that it produces no ill effects on one's health per a letter dated 12/22/2016 from Warden Hepp. Ms. Whitman states providing the inmate with bottled water is not medically indicated." Dkt. 1-1, at 6. The reviewing authority dismissed the grievance. Smith appealed. The corrections complaint examiner recommended dismissal, stating that the Department of Corrections was continuing to work with the Department of Natural Resources on complying with the Safe Drinking Water Act and that inmates were advised to run their tap water before drinking it. The office of the secretary dismissed the appeal.

Smith was seen by doctors, a physical therapist, and nursing staff several times in the first half of 2017. There is no record of Smith asking about bottled water at those appointments. Whitman does not directly treat patients and she did not have the authority to directly issue a prisoner bottled water. A doctor or other advanced provider could have done so, but nothing in Smith's medical records indicates that a provider thought that bottled water was appropriate for his condition.

## ANALYSIS

I granted Smith leave to proceed on a claim that defendant Whitman violated the Eighth Amendment to the United States Constitution by refusing his requests for different water, causing him to suffer headaches, stomach pain and cramps, nausea, and bloody diarrhea.

The Eighth Amendment prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which

5

the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Smith's claims fail in part because he fails to show that his underlying health problems were caused by the water at FLCI. Smith is not a medical professional, so he is "not competent to diagnose himself, and he has no right to choose his own treatment." *Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017). In some medical care cases, it is obvious to a lay person that a plaintiff is correct in blaming a particular cause for his injuries. But here, Smith would need an expert to make the link between the contaminants and his headaches or gastrointestinal problems.

Pro se plaintiffs often seek recruitment of counsel when expert testimony might be necessary to prove their claims. Smith has not filed a motion for recruitment of counsel, but even if he had, I would deny it. Given the dearth of willing counsel available to take pro bono cases, this court should not recruit counsel "if the plaintiff's 'chances of success are extremely

slim.'" *Watts v. Kidman*, 42 F.4th 755, 766 (7th Cir. 2022) (quoting *Maclin v. Freake*, 650 F.2d 885, 887 (7th Cir. 1981)). I consider it extremely unlikely that recruited counsel would be able to find an expert drawing a connection between the FLCI water and the seemingly unrelated medical problems that Smith had.

The court has already expended resources by appointing a medical and toxicology expert, Alfred Franzblau, to review the medical records of plaintiffs proceeding with individual medical-care cases about the FLCI water. *See Stapleton*, No. 16-cv-406-jdp, Dkt. 170 (W.D. Wis. Apr. 3, 2020). Smith's records were not included with those reviewed by Franzblau, but Franzblau considered the records of 14 other inmates—including several with high blood pressure—and concluded that it was unlikely that they suffered any acute or chronic toxic effects from the metals that Franzblau considered (arsenic, copper, lead, and manganese). And in particular, he stated that "it is unlikely that any of the 14 inmates has experienced any chronic symptoms or other chronic toxic effects . . . from ingestion of lead in the drinking water at FLCI during the time period in question." *Turner v. Hepp*, No. 19-cv-431-jdp, 2023 WL 2571771, at *4 (W.D. Wis. Mar. 20, 2023). He came to this conclusion in large part because "the risk of chronic toxic effects related to lead (such as high blood pressure or cancer) is generally related to cumulative (i.e., many years) or lifetime exposure to lead, and not brief episodes of over-exposure, such as those lasting for a few months, as in the situation at FLCI." *Id*.

The bottom line here is that Smith assumes that his health problems were caused by contaminants in the FLCI water. But his mere speculation that the water caused his injuries is not enough to create a disputed issue of material fact on that issue. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to

7

all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). Because Smith fails to show that his underlying health problems were caused by the FLCI water, he cannot show that he was harmed by Whitman's actions or inactions.

Smith also fails to show that Whitman consciously disregarded his medical problems. Whitman was not directly involved in Smith's medical care, and Whitman did not have the authority to order him bottled water. Whitman sent him a memo stating that the water had been deemed safe for consumption and she told the grievance examiner the same thing. That does suggest that Whitman could have done something to intervene in Smith's medical treatment if she thought it was appropriate to do so. But there is nothing in the record that could lead a reasonable jury to conclude that Whitman was aware of a risk of harm to Smith yet disregarded it. Whitman had been told that the FLCI water was safe to drink, and there wasn't anything in his medical records suggesting that his providers were concerned about the water. Because Smith fails to show that his health problems were caused by the FLCI water or that Whitman consciously disregarded his problems, I will grant Whitman's motion for summary judgment and dismiss the case.[3]

After his final deadline for submitting his summary judgment response passed, Smith submitted a letter asking "for help on buying medication for the [stomach] infection whenever it comes back" and asking the court "to award [him] the sum that you feel would help [him] when [he] makes it to the free world." Dkt. 63, at 1. Smith fails to show that he is entitled to

---

[3] Whitman also contends that she is entitled to qualified immunity on Smith's Eighth Amendment claim. Because I am dismissing Smith's claim on the merits, I need not consider Whitman's qualified immunity argument.

money damages in this case because his claim fails on the merits. Any claim about inadequate medical care for his current stomach problems belongs in a separate lawsuit.

ORDER

IT IS ORDERED that:

1. Defendant's motion for summary judgment, Dkt. 50, is GRANTED.
2. The clerk of court is directed to enter judgment accordingly and close this case.

Entered June 1, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge